GREGORY CHARLES, ESQ., BAR NO. 208583
CAMPEAU GOODSELL SMITH
440 North First Street, Ste. 100
San Jose, California 95112
Telephone: 408.295.9555
Facsimile: 408.852.0233
gcharles@campeaulaw.com

*Counsel for Tvia, Inc.*

UNITED STATES DISTRICT COURT

NORTHEN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TVIA, INC. | Case No. 08-cv-01908-SC |
| Plaintiff, | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT MOTION TO REMAND** |
| vs. | |
| BENJAMIN SILVA, TSU HSIEN "STEVE" WANG, MATTHEW MCKEE, DIANE BJORKSTROM MICHAEL BUTTRICK, YK SYNNET, A JAPANESE CORPORATION AND DOES 1 TO 100, INCLUSIVE | Judge: Hon. Samuel Conti<br>Hearing: July 11, 2008<br>Time: 9:00 a.m.<br>Place: Courtroom 1 |

Tvia, Inc., ("TVIA") hereby requests that the Court take judicial notice of TVIA's First Amended Complaint filed in this action in the Superior Court which is attached hereto as Exhibit 1 and an order entered in those proceedings entitled *Tvia, Inc. v. NBG, et al.* Case No. 1-07-CV-084211 pending in the Superior Court on January 11, 2008 which is attached hereto as Exhibit 2.

Dated: May 8, 2008                    CAMPEAU GOODSELL SMITH
                                                      A Law Corporation


                                                      By:     /Gregory J. Charles
                                                      GREGORY J. CHARLES
                                                      Attorneys for Plaintiff

Campeau Goodsell Smith
A Law Corporation
San Jose, California

**Exhibit 1**

1   Jefferson T. Stamp (SBN 187975)
Attorney at Law
2   15650-A Vineyard Blvd., #146
Morgan Hill, CA 95037
3   Telephone: (408) 327-8020

4   Attorney for Plaintiff
TVIA, INC.

5

6

7          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8      **COUNTY OF SANTA CLARA - UNLIMITED JURISDICTION**

9

10   TVIA, INC.,                   Case No.: 1-08-CV-104728
a Delaware corporation,
11

           Plaintiff,           **FIRST AMENDED COMPLAINT**
12

13      v.                  **1. Insider Trading**
                          **2. Breach of Fiduciary Duty of Loyalty**
14   BENJAMIN SILVA, an individual;    **3. Breach of Fiduciary Duty of Care**
   TZU HSIEN "STEVE" WANG, an individual; **4. Fraud**
   MATTHEW MCKEE, an individual;     **5. Unjust Enrichment**
15   DIANE BJORKSTROM, an individual;
   MICHAEL BUTTRICK, an individual;
16   Y.K. SYNNET, a Japanese Corporation; and
   DOES 1 to 50, inclusive,
17

           Defendants.
18

19

20                    **INTRODUCTION**

21         1. Tvia, Inc. ("Tvia" or the "Company") is a Delaware corporation. The Company's

22   business includes the development and sale of display processors or "chips" for high definition

23   LCD televisions. At all relevant times herein, the Company's shares were publicly traded on the

24   NASDAQ stock exchange. Though the Company's stock has recently been delisted from

25   NASDAQ, the Company's shares are still publicly traded.

26         2. The former sales team of Tvia, consisting of Defendants Silva, Wang, McKee

27   and Buttrick (the "Sales Team"), engaged in a pattern and practice of entering into undisclosed side

28   agreements with a number of "distributors" usually near the end of a quarter of the Company's

1  fiscal year. A side agreement would typically provide that the distributor would not have to pay in

2  accordance with the terms of a written purchase order and/or had the right to return the inventory if

3  it could not be sold.

4       3. Failing to disclose side agreements to the Company constitutes a significant

5  omission by the Sales Team because the Company relies on the accuracy of its purchase orders in

6  stating its revenue for a particular quarter in publicly filed financial statements. The Company

7  generally recognized revenue upon shipment and a reasonable assurance of payment. A legitimate

8  purchase order with no side agreement generally provides a reasonable assurance payment and a

9  basis upon which the Company's financial statements can be made. In turn, the public relies on the

10  accuracy of the Company's publicly filed financial statements in trading the Company's stock.

11       4. The Sales Team engaged in the practice of entering into undisclosed side

12  agreements with distributors so that the distributors would more readily sign a purchase order to the

13  Company and receive a shipment from the Company. In this regard, the distributors were

14  essentially acting as sham middlemen and were used by the Sales Team to fraudulently meet

15  revenue goals for the purpose of triggering commission bonuses and stock option grants to

16  themselves.

17       5. When the sham middlemen did not pay per their undisclosed side agreements, the

18  Sales Team and former CFO Diane Bjorkstrom directed payments from new customers to the

19  accounts of the delinquent distributors in a blatant and intentional attempt to conceal the earlier

20  sham transactions. Silva and Wang directed at least four of the new customers to wire funds in the

21  approximate amount of $600,000 to the Company to help cover the aging receivables of the

22  delinquent distributors. Based on additional side agreements, the new customers believed they

23  were either making a refundable deposit, securing guaranteed manufacturing and distribution rights

24  or had the right to return unsold product. The clandestine transactions directed by the Sales Team

25  constitute an elaborate type of ponzi scheme detailed in charts set forth in Exhibit A ("Transaction

26  Charts").

27       6. Silva and Wang, with assistance from McKee, concealed the new customers from

28  the Company and falsely represented that these new companies were paying agents or customers of

the delinquent distributors.  Former CFO Diane Bjorkstrom was aware the money was coming from different sources and approved the misapplication of funds.

7. The Sales Team actively concealed the side agreements, created and altered customer purchase orders, intentionally directed the money to the wrong accounts, used sham middlemen to inflate shipments within a particular quarter and also embezzled inventory.  Each member of the Sales Team was actively involved in at least one major respect, including defendants Benjamin Silva, Matthew Mckee, Tzu Hsieh "Steven" Wang and Michael Buttrick (who operates in Japan as Y.K. Synnet, Inc.), as more specifically described below.

8. As a result of these actions by the Sales Team, and with the connivance and assistance of Bjorkstrom, it is estimated that more than half of the Company's stated revenue from Q1 FY 2006 (quarter ended June 30, 2005) to Q2 FY 2007 (quarter ended September 30, 2006) was improperly recognized in the Company's publicly filed financial statements.

9. The scheme was designed by the defendants as part of a conspiracy to defraud the Company into paying the Sales Team commissions, bonuses and stock option grants that were tied to revenue goals.  As a result, the Sales Team improperly received more than $1 million in fraudulently obtained commissions and bonuses between 2005 and 2006.

10. In addition, the Sales Team was motivated by the potential for stock option gains and, thus, desired to keep the Company's stock price artificially high.  The misapplication of funds to the delinquent accounts was part of a cover up which concealed the use of sham middlemen and delayed any reversal of revenue that might have impacted the Company's stock price.

11. When the Sales Team engaged in the sale of stock from their options, they unlawfully traded on inside information (i.e., non-public material information) because they were the only ones who knew that the Company's revenue had been artificially inflated through the use of the sham middlemen, the misapplication of funds and other wrong doing, as alleged herein.  In August 2006, Silva, Wang and McKee, made approximately $437,000 in gains from these unlawful stock transactions.

12. After the discovery of the wrongdoing, the Company incurred substantial costs of approximately $1.5 million in outside auditing and legal fees which were required to complete the Company's restatement and Audit Committee investigation.

13. The exercise of stock options and sale of stock by Silva, Wang and McKee, with knowledge of the side agreements, misapplication of funds and other concealed wrongdoing, constitutes a violation of California law prohibiting insider trading. The wrongdoing of the defendants described herein constitutes violations of the defendants' duties of loyalty and care as well as fraud.

14. Plaintiff has filed this action seeking, among other things, (1) damages of approximately $2.4 million for insider trading violations pursuant to California Corporations Code § 25502.5, (2) forfeiture of the approximately $1 million in wrongfully obtained commissions and bonuses pursuant to *J.C. Peacock, Inc. v. Hasko*, 196 Cal. App. 2d 353 (1961), and (3) damages of $1.5 million for the costs incurred during the Company's restatement and Audit Committee investigation, which directly resulted from the defendants' disloyal and fraudulent conduct.

## PARTIES AND JURISDICTION

15. Plaintiff Tvia, Inc. ("Tvia" or the "Company") is a corporation in good standing, duly organized and existing under the laws of the state of Delaware, with its principal place of business at 4001 Burton Drive, Santa Clara, California.

16. Defendant Benjamin Silva is an individual residing in Alameda County, California. Ben Silva is a former Vice-President of sales for Tvia.

17. Defendant Tzu Hsien "Steve" Wang is an individual residing in Santa Clara County, California. Steve Wang is a former sales manager for Tvia.

18. Defendant Matthew McKee is an individual residing in Placer County, California. McKee is a former sales manager for Tvia.

19. Defendant Diane Bjorkstrom is an individual residing in Santa Clara County, California. Bjorkstrom is a former Chief Financial Officer for Tvia.

20. Defendant Michael Buttrick is an individual residing in Japan. Buttrick is a former sales manager for Tvia operating in Japan through his company Y.K. Synnet Inc.

1    21. Defendant Y.K. Synnet is a Japanese corporation with its principal place of

2    business in Tokyo, Japan (Y.K. Synnet and Buttrick shall be referred to herein collectively as

3    "Buttrick").

4    22. Defendant Does 1 to 50 are unknown at this time and therefore plaintiff sues

5    them by said fictitious names. Plaintiff will amend this Complaint to substitute the true names and

6    capacities of these defendants when they are ascertained.

7    23. Plaintiff is informed and believes, and thereon alleges, that at all times

8    mentioned in this Complaint, defendants were each the agents or co-conspirators with their co-

9    defendants, and in doing the things alleged in this Complaint were acting within the course and

10    scope of said agency or conspiracy.

11    24. The Santa Clara County Superior Court has jurisdiction over this action and

12    venue is appropriate in this Court because the actions of the defendants as alleged herein occurred

13    in Santa Clara County and at least one of the defendants resides in Santa Clara County.

14                                **GENERAL ALLEGATIONS**

15    25. Plaintiff makes the following general allegations which are common to each

16    cause of action.

17        **26. Tvia's former Sales Team includes Silva, Wang, McKee & Buttrick.**

18            a.       Benjamin Silva
                       Vice-President of World Wide Sales
19                     Hired:  September 28, 2004
                       Resigned:  January 18, 2007
20

21            b.       Tzu Hsieh "Steven" Wang
                       Sales Manager, Greater China (P.R.C., Hong Kong, Taiwan)
22                     Hired: October 1, 2004
                       Terminated:  April 15, 2007

23            c.       Matthew McKee
                       Sales Manager, North America and Europe
24                     Hired: March 7, 2005
                       Terminated: April 13, 2007
25

26            d.       Mike Buttrick (operating as Y.K. Synnet, Inc. in Japan)
                       Sales Manager, Japan, Korea and ASEAN region
                       Hired: October 1, 2004
27                     Terminated:  April 30, 2007

28

**27. The former Sales Team worked with Bjorkstrom at another company.**

Beginning in approximately 2002, the group of Silva, Wang, McKee and Buttrick, worked together at a company called iVAST Inc., and later at DG2L Technologies, Inc., which acquired the assets of iVAST in March 2004 as part of a bankruptcy. In October 2004, Silva was recommended as a potential V.P. of Sales by Tvia's CFO Diane Bjorkstrom. Bjorkstrom knew Silva from iVAST where she served as Interim CFO. After he was hired by Tvia, Silva immediately brought in Wang and Buttrick, and eventually brought in McKee.

**28. Commissions to the Sales Team were made conditional upon revenue goals.**

a.    Silva's commissions

Silva's offer letter provides for a commission of 2.5% of the total revenue of the Company. However, the commission was made conditional upon the sales organization "delivering 75% or more of the quarterly plan."

b.    Wang's commissions

Wang's offer letter provides for a commission of 7% on all sales generated in the "Greater China territory". However, the commission was made conditional upon the sales organization "delivering 75% or more of the quarterly plan."

c.    McKee's commissions

McKee's offer letter provides for a commission of 7% on all sales generated in the "US and Europe territory". However, the commission was made conditional upon the sales organization "delivering 75% or more of the quarterly plan."

d.    Buttrick's commissions

Buttrick's relationship with the company was governed by an independent contractor agreement with Buttrick's Japan company called Y.K. Synnet Inc. Though not required under the contractor agreement, the Company later agreed to provide commissions to Buttrick on the same terms as the rest of the Sales Team.

/ / /

/ / /

/ / /

**29. Silva, Wang & McKee received stock options tied to revenue goals.**

    a.    <u>Option Grants to Silva</u>

On September 30, 2004, Silva was granted 250,000 stock options at $1.50 per share (25% of these options vested one year after the grant date, and thereafter 1/48[th] of these options vested monthly).

On May 19, 2005, Silva was granted an additional 50,000 stock options at $1.39 per share (25% of these options vested one year after the grant date, and thereafter 1/48[th] of these options vested monthly).

On May 19, 2005, Silva was granted an additional 70,000 stock options at $1.39 per share (these were "performance" options which vested if the Company reached $5 million in revenue within any fiscal quarter by June 30, 2006).

    b.    <u>Option Grants to Wang</u>

On November 5, 2004, Wang was granted 100,000 options at $1.20 per share (25% of these options vested one year after the grant date, and thereafter 1/48[th] of these options vested monthly).

On May 19, 2005, Wang was granted an additional 20,000 stock options at $1.39 per share (these were "performance" options which vested if the Company reached $5 million in revenue within any fiscal quarter by June 30, 2006).

    c.    <u>Option Grants to McKee</u>

On May 19, 2005, McKee was granted 100,000 stock options at $1.39 per share (25% of these options vested one year after the grant date, and thereafter 1/48[th] of these options vested monthly).

On May 19, 2005, McKee was granted an additional 20,000 stock options at $1.39 per share (these were "performance" options which vested if the Company reached $5 million in revenue within any fiscal quarter by June 30, 2006).

**30. Buttrick received cash-settled stock appreciation rights.**

On or about November 5, 2004, Buttrick was promised a cash bonus tied to the Company's stock price and which would approximate the profit generated from the sale of 100,000

1   stock options at $1.20 per share (25% of the bonus vested one year after the grant date, and

2   thereafter 1/48[th] of these options vested monthly).

3           On May 19, 2005, Buttrick was promised an additional cash bonus tied to the

4   Company's stock price and which would approximate the profit generated from the sale of 20,000

5   stock options at $1.39 per share (these were "performance" options which vested if the Company

6   reached $5 million in revenue within any fiscal quarter by June 30, 2006).

7                           **THE STOCK OPTION BONUS**

8           **31. Silva "will stop at nothing" to drive the stock up and become rich.**

9           On November 13, 2005, Silva writes to the Sales Team (Wang, McKee and Buttrick)

10  to ask for a list of customers they will close for the quarter. He then explains that they must reach

11  their quota to drive the stock: "…we cannot afford to let pride keep us from driving the stock up to

12  $5 then $10. We are in this to win and win big. I will stop at nothing to guarantee that this one

13  goes all the way. We have not missed a number and we will not miss a number. I will make you a

14  lot of money and successful whether you want it or not…. PREPARE TO BE RICH ….NO

15  MATTER WHAT."

16          **32. Silva sought "creative ways" to make numbers & keep the stock up.**

17          On November 23, 2005, Silva writes to the Sales Team (Wang, McKee and

18  Buttrick): "We just got our fi[r]st anal[y]st coverage who has predicted $2.2 mil this quarter. If we

19  come in less, our stock will suffer." (On November 24, 2005, the Company's stock price closed at

20  $2.25 per share). Later, in the same e-mail, Silva continues: "We must also look at creative ways

21  to help should someone come up short, what we can do. We could use another distributor like

22  Ricom somewhere else in the world, that would be very helpful for us. Anyone got an[y] ideas???"

23                           **THE RICOM ACCOUNT**

24          **33. Ricom was a sham middleman used to inflate revenue for the quarter.**

25          Ricom is a small trading shop (Mr. Cheng Xinmin) with a small office in one of the

26  older business districts in Shenzhen, China. As alluded to by Silva above, Ricom was used soon

27  after the sales team arrived to help them reach "the number" in case they came up short. Ricom

28  was a distributor for their previous company iVAST/DG2L. Within nine months of the arrival of

Silva and Wang to the Company, Ricom constituted 33% of the Company's business ($369,429) for the quarter ended June 30, 2005 (Q1 FY 2006). However, Ricom was not a legitimate customer. Silva and Wang stockpiled the inventory with Ricom in order to make the sales plan number and to secure their commissions and bonuses, albeit fraudulently.

### 34. Silva admitted that Ricom was a sham middleman.

Silva later confirmed in an e-mail to Wang how they used Ricom to provide additional time for payment by end-customers: "… we put many customers through Ricom to guarantee they could make the payments." Instead of waiting for when the end-customers might really be in a position to order and pay for product, the sales team had the product shipped to Ricom's agent in Hong Kong (Fu Cheong) so that the "expected" revenue from the shipment could be recognized as a sale to Ricom for the earlier quarter.

### 35. Inventory was stockpiled at the warehouse of Ricom's Hong Kong agent.

Ricom was a sham middleman who placed orders and stockpiled inventory of Tvia's products upon instructions from Wang and Silva. The motivation for stockpiling inventory was revenue recognition. Knowing that Ricom was not a real customer, Wang and Silva sought to buy more time to make the quarter's revenue number by temporarily shipping to Ricom's Hong Kong agent (Fu Cheong). They then planned to liquidate the inventory after the quarter end.

### 36. Silva and Wang tried to sell Ricom's inventory.

The stockpiling of products at Ricom put the sales team in the position of having to sell the product on behalf of Ricom or risk the reversal of revenue. On November 3, 2005, Wang provided an update to Silva about Ricom's inventory and the need to sell 28,000 units of Tvia's 5600 chip:

> "Ben:
>
> Just for your information.
> Ricom has 10+18=28k 5600 in hand.
> We need to unload 28k so Ricom can pay sooner.
> Let [me] know your plan so I have a whol[e] picture.
>
> Steve"

In response, Silva writes: "We will sell all of their inventory this month."

**37. In December 2005, Wang outlined collection efforts for Ricom.**

On December 14, 2005, Wang sent an e-mail to Silva outlining the source of the cash intended to cover the Ricom account, which included even the possibility of obtaining a "bank loan":

> "This is my latest update.
> Cash collection from Ricom will be:
>
> 1. 1st payment around 40k
> 2. 80k (from Sam)
> 3. 90k (from Patrick)
> total 210k
>
> 4. possible another 20k
> 5. bank loan another 35k
> possible another 55k
>
> Maximum 210+55=265k
>
> Steve"

**38. McKee reminded Wang about the stock bonus.**

On December 14, 2005, in an intentional attempt to motivate Wang's effort to cover the Ricom account, Silva prompted McKee to send an e-mail to the entire Sales Team underscoring that they need to do "what ever it takes" to reach the $5 million quarter because he does not want to lose out on the extra stock options:

> "Our bonus in Q1 next year depends on EVERYONE pulling their weight. It is a $5M quarter, and there is just no way that we will make it if everyone does not pull their own weight (sic) we need to strategize on how we can maximize the business available to us in each region (sic) I will not be losing out on my extra stock options I promise you that. What ever it takes more sales guys, more reps."

**39. Silva was afraid of having to reverse the revenue on the Ricom account.**

On December 28, 2005, Silva and Wang were still scrambling to raise the $200,000 at the end of the quarter. In a December 28 e-mail, Silva states: "We must have the $200K or more paid, or we will not only lose the revenue from customers we put through[h] Ricom, we will also lose over $200 K in revenue due to revenue reversal since Ricom did not pay. We will lose twice.... Please be sure they wire over $100K, or have some of the customers wire directly to Tvia HQ, like Sinobond. We only have 1 more day!!!!!" Silva was trying to collect as much cash as

1    possible for Ricom before the end of the quarter so that he could convince the auditors not to

2    reverse the revenue on the Ricom account.

3                              **MISAPPLICATION OF PROTECH'S PAYMENT**

4            **40. $100,000 from Protech was used to pay the delinquent Ricom account.**

5            Silva and Wang devised an alternate plan to pay the Ricom account with money

6    from Protech Perennial Ltd. ("Protech").

7            On February 23, 2006, Wang writes to Silva: "Protech is scheduled to wire payment

8    to Tvia HQ on 2-27. $100,000 USD." The following day, the Company did receive a wire from

9    Protech for $100,000.

10            An e-mail from an accounting staff person, Cathy Chu, to Silva's assistant Brittney

11    Pan confirms that the $100,000 from Protech was applied to Ricom per the direction of Silva and

12    Bjorkstrom:

13            "Hi, Brittney:

14            "You are right!  Diane and Ben just come to say that the $100,000.00 we received
        from Protech will offset the oldest Ricom invoice# 0805-025."
15

16            **41. Protech later claimed the $100,000 was a refundable deposit.**

17            In October 2007, several months after the resignation of Silva and the termination of

18    the rest of the Sales Team, Protech made a demand for the return of the $100,000. Protech claimed

19    that the $100,000 was merely a refundable deposit and that they never received any inventory for

20    the money. In support of its claim, Protech produced a purchase order dated February 24, 2006,

21    that purported to be an order placed with Tvia, and not Ricom. The purchase order specifies an

22    amount of $100,000 with the item and quantity ordered "to be advised." Protech claimed that this

23    purchase order was provided to Wang and that the order was required to become a licensee of

24    Tvia's board design. Protech further claimed that the payment was refundable if the board design

25    proved unworkable for their TV production. Silva and Wang concealed the document from the

26    Company.

27    / / /

28    / / /

**42. Wang, Silva and Mckee conspired to conceal the Protech P.O. from Tvia.**

In April 2006, Protech's president wanted to visit Tvia. Since Wang was in China, he asked for McKee's help: "need your help to meet him at HQ." Wang then writes to Silva: "Please call Matt about who to meet and who to avoid." Silva and McKee subsequently set up the strategy after exchanging a few e-mails: "We need to talk before this meeting." In keeping with the plan to conceal the Protech purchase order, McKee made sure the $100,000 payment from Protech was not discussed at the Company's headquarters. McKee later wrote to Wang and Silva: "I controlled all conversations and kept them light."

**43. Wang embezzled the Protech inventory.**

Following his termination from Tvia, Wang used his control over Ricom to obtain possession of the inventory that had been designated for Protech but not delivered. There were 12,500 units of Tvia chips (valued at $8 per unit) which were stored at the warehouse of Ricom's Hong Kong agent (Fu Cheong). In May 2007, upon instructions from Wang, Ricom released the inventory to Wang who claimed to be taking the inventory for the benefit of Protech. However, the Company is informed and believes that Protech never received the inventory and that Wang is selling the units and pocketing the money for himself.

**Q3 FY 2006**

**(Quarter ended December 31, 2005)**

**44. Silva and Buttrick entered into an undisclosed side agreement with MJL.**

When Silva asked the sales team for other distributors "like Ricom," Buttrick offered MJL. On December 9, 2005, Buttrick sent an e-mail to Silva: "MJL agreed, pending our 'special terms letter', to issuing a PO for 10K [units] = $110K".

On December 12, 2005, Silva approved the "special terms letter" for MJL and another customer MNK (Micro Netwok Korea) for Silva's approval. The special terms letter provides that if MJL has not identified a customer for the product within 90 days, Tvia will extend payment terms to 120 days or Tvia will arrange for MJL to sell the products to a suitable 3rd party.

On December 16, 2005, MJL issued a purchase order for 10,000 units in the amount of $110,000. The purchase order was submitted in Tvia's records without any reference to the

special terms letter. As a result, the purchase order should not have been recognized as revenue for the Company for the quarter ended December 31, 2005. The MJL shipment of 10,000 units was directed to the Fu Cheong warehouse in Hong Kong per Buttrick and Silva's instruction. See Exhibit A (Transaction Chart 6).

**45. Money from a different customer was applied to MJL's account.**

On July 31, 2006, Fu Cheong wired $39,982 to Tvia and this amount was applied to the December 2005 MJL purchase order. The money originated from a $100,000 payment made by another customer SFD. See Exhibit A (Transaction Chart 9). The sales team used the Fu Cheong company in Hong Kong as an intermediary which concealed the true source of the funds. The sales team and Bjorkstrom were more concerned with covering the older receivables like MJL, and so used the money from SFD (which was a more recent customer) to cover MJL's account in another example of the ponzi scheme.

**46. Bjorkstrom approved the misapplication of funds.**

On September 27, 2006, Bjorkstrom sent an e-mail to Finance support staff informing them that: "I believe SFD sent MJL's money.... Do NOT apply to SFD. Apply all cash to the oldest invoices." On September 28, 2006, SFD's payment of $34,478.29 was applied to the 2005 MJL purchase order. See Exhibit A (Transaction Chart 8).

**47. Silva and Buttrick entered into an undisclosed side agreement with MNK.**

On December 8, 2005, Buttrick sent an e-mail to Micro Network (MNK), a distributor in Korea, explaining two sets of terms for the planned purchase of 25,000 units for $225,000. Buttrick explained that the first set of terms covered items to be written on the purchase order and that a separate formal letter "defining special terms" would also be provided. The difference between the two sets of terms related to the timing of the payment. On the purchase order, Buttrick explained that the payment terms would be listed as "90 days". However, in the side letter, payment was extended out to six months.

**48. Silva knew there was a problem with revenue recognition for MNK.**

On December 12, 2005, in response to Buttrick's request for a sign off on the special terms letter, Silva writes: "Technically we cannot recognize $150K of this revenue." However,

Buttrick explained to Silva that MNK "would not agree to placing the P/O unless we could extend the special terms out to April & May." Silva responded with an electronic signature for the special terms letter. Because of the special terms letter, at least $150,000 of the $225,000 order from MNK probably should not have been recognized for the quarter ended December 31, 2005 (Q3 FY 2006).

**49. Silva bragged about convincing the auditors about Q3 FY 2006 revenue.**

Silva later bragged about convincing the auditors: "Q3: We will get our $2.47M for last quarter. Yes I was right; best of all the auditors agreed with me (Diane will never admit she was wrong)." However, the amount was inflated because of the undisclosed side agreements.

### Q4 FY 2006

### (Quarter ended March 31, 2006)

**50. Silva hyped TV manufacturing projects to inflate revenues and meet goals.**

In an e-mail dated January 31, 2006, Silva writes: "We must do about $3.1 to 3.2 Million this quarter. We MUST concentrate on ALL projects that will go into MP this quarter and Next quarter. Otherwise we will not make the $5M next quarter, which we must make for sure."

In some instances, the Sales Team made promises to license TV board designs to companies that wanted to manufacture flat screen TVs if they committed by sending a purchase order for Tvia chips. The idea was that the Tvia chips would be consumed when the manufacturers went into mass production. However, in order to close the deals, the sales team invariably had to offer extended repayment terms and/or promises to sell any unused inventory. These promises were confirmed by the Sales Team in "special terms" letters similar to what was provided to MJL and MNK.

The TV manufacturing companies that were solicited by the sales team included Universal Technology ("EUT"), Sichuan Friend Digitial Technology Co., Ltd. ("SFD"), Shenzhen Quitong Electronic Technology Co., Ltd. ("Quitong"), Shenzhen South Sun Technology Electronic Co., Ltd. ("South Sun") and China Merchant, among others. However, the side agreements (including promises of large manufacturing contracts and the right to return unused inventory) with these manufacturers were not disclosed. The intentional concealment of the side agreements had the effect of fraudulently inflating the Company's publicly stated revenues.

**51. Silva, Wang and Buttrick created the Purchase Orders.**

The Sales Team was so involved in the manufacture of the sham transactions that they actually created the purchase orders for the "customers." Purchase order documentation was created for the manufacturers named above such as SFD, among others.

**52. Silva entered into an undisclosed side agreement with SFD.**

On April 27, 2006, SFD was promised orders for 50,000 televisions in a Letter of Intent signed by Silva ("LOI"). However, Silva never disclosed the LOI to the Company. SFD was required by Silva to place orders for chips in exchange for Silva's LOI. SFD placed two orders through its Hong Kong affiliate (Hooray Electronics Co., Ltd.) and through Fu Cheong. Silva asked SFD to pay $100,000 to Fu Cheong so that the money could be misapplied to Ricom's account as well as another manufacturer, South Sun, who had not paid for an earlier order based on an earlier undisclosed side agreement. In April 2006, approximately $85,000 was wired to Tvia from Fu Cheong and applied to the outstanding receivables of Ricom and South Sun. This money actually originated from SFD. See Exhibit A (Transaction Chart 9).

**53. The Sales Team intended to manipulate Tvia's stock.**

On March 29, 2006, McKee sent Silva an e-mail indicating factors that might propel the stock to $4.00: "If we have this type of momentum now and we can hold it for the next several weeks until Q announcement and have it followed by some press we could hypothetically hover this at the $4 mark with what we know now of buyer strategies." McKee was talking about the revenue announcement for Q4 2007, which ended on March 31, 2006. However, in order to maintain the "momentum," the Sales Team had to take the sham transactions to a new level.

**54. Tvia shipped $1.19 M worth of goods on the final day of the quarter.**

On March 31, 2006, Tvia shipped $1.19 million in product, representing more than 40% of the revenue for the quarter, to two customers: EUT and MNK. However, neither shipment should have been recognized as revenue for the quarter as a result of the side agreements. The side agreement with EUT states that if EUT has not identified a customer within the payment period, Tvia will ship the product elsewhere or extend the payment terms. The side agreement with MNK was documented in an e-mail from Silva to MNK president J.H. Jang, in which Silva promised to

1  take back any unused inventory: "I had allocated the 50k units of MNK, with the understanding

2  that if MNK did not move the parts by June, Tvia would be taking ALL UNUSED parts backed to

3  supply our other customers."

4          **55. Bjorkstrom supervised the end-of-quarter shipments in China.**

5        At the end of each quarter, Bjorkstrom would generally travel to China in order to

6  supervise the shipments. On March 30, 2006, an e-mail from Bjorkstrom illustrates how she and

7  the Sales Team rushed to get the "paperwork" complete for EUT and MNK, and then get the

8  product on "the truck" before the end of the quarter: "Steve W and Jinju are finalizing EUT. If you

9  want to get MNK on the truck with EUT, I need the PO. If you want a separate truck I still need the

10 paperwork to call a forwarder or at least the information as to where to ship??"

11       MNK's order was ultimately shipped to EUT in order to make the deadline. This is

12 because the PO that was faxed from MNK to Bjorkstrom designated that the shipment of the 50,000

13 units should be in 6 to 10 weeks, which would be after the end of the quarter. Bjorkstrom assisted

14 the sales team to inflate the number for the quarter by recognizing revenue on the PO for MNK

15 before MNK wanted the shipment. Bjorkstrom and the sales team did so by temporarily shipping

16 MNK's order to EUT.

17       In addition to MNK, even more inventory was shipped under the EUT purchase

18 order based on the potential deals with two other companies called Nucleus and SAC. The boxes

19 delivered to EUT were labeled with the names of Nucleus and SAC. Bjorkstrom knowingly

20 shipped boxes to EUT in order to recognize the revenue on these additional deals that were not yet

21 finalized with the real end-customer. In fact, Nucleus and SAC never finalized these orders.

22       **56. The inflated quarterly revenue drove the stock above $3.00 per share.**

23       With the announcement of the Company's revenue for the quarter ended March 31,

24 2006, which revenue was based substantially on the sham transactions perpetuated by the Sales

25 Team and Bjorkstrom, the Company's stock climbed above $3.00 per share.

26 ///

27 ///

28 ///

1  **Q1 FY 2007 - The $5 Million Quarter**

2  **(Quarter ended June 30, 2006)**

3      **57. Silva talks of "strategy" to make the number for the quarter.**

4          The sales team continued to use the same "strategy" of side agreements and

5  temporary storage of inventory at the end of the quarter to attain $5 million in revenue for Q1 FY

6  2007. On June 19, 2006, Silva writes to the Sales Team (Wang, Buttrick & McKee): "here we are

7  two weeks from quarter end and everyone expects that we can ship $5M in one week. It is

8  physically impossible." Silva then states: "I need all POs in by this Friday. We will need to know

9  exactly how much we are short, so that Steve and I have one week to strategize and execute on

10  what we are short."

11          The strategy was executed on the final two days of the quarter when the Sales Team

12  and Bjorkstrom shipped 657,762 units for a total of $3,760,877 in orders mainly to Fu Cheong (the

13  Hong Kong agent of Ricom) and SFD.

14      **58. SFD was asked to make up the shortfall based on a new side agreement.**

15          In June 2006, Silva asked Buttrick where they stood with SFD for the quarter.

16  Buttrick's response was that an SFD order for 100,000 units was "sketchy". Thereafter, Silva and

17  Wang asked SFD to be Tvia's distributor for a collection of small orders worth more than $3

18  million which Silva and Wang represented would close very soon. They promised SFD that they

19  would not have to pay on the purchase order until receipt of payments from the real end customers.

20  Silva and Wang represented that SFD stood to earn substantial commissions from the sales if it only

21  agreed to accept the huge shipment on a temporary basis. Buttrick and Wang created the purchase

22  order and submitted to SFD for signature. The final purchase order was for approximately $3.155

23  million for the sale of 571,682 units. SFD signed the purchase order in response to Silva's pleas for

24  assistance in helping him meet the revenue goal for the Company. The chips were delivered to

25  SFD's affiliated warehouse in Hong Kong. The substantial majority of the chips were never sold.

26          The SFD purchase order constituted approximately 62% of the Company's revenue

27  for the quarter ended June 30, 2006. This was an amazing turnaround for an account which Buttrick

28  listed as "sketchy" only a few weeks earlier. The Company would not have reached $5 million in

1  revenue, and actually would have been more than $3 million short, without the sham purchase order

2  from SFD. Given the side agreements with SFD, the $3.155 million purchase order should not have

3  been recognized as revenue for the quarter.

4         **59.    The sales team continued with a sale that had actually been cancelled.**

5         On June 29, 2006, Sino-American Electronics Co., Ltd. ("SAC") sent an urgent e-

6  mail cancelling its $300,000 purchase order for 40,000 units. Notwithstanding the cancellation, the

7  order was apparently counted as revenue for the quarter and never reversed. Instead, Silva

8  instructed the shipment to Fu Cheong for storage. See Exhibit A (Transaction Chart 1).

9  As a result of the cancellation, the $300,000 purchase order from SAC should not have been

10  recognized as revenue for the quarter.

11         **60.    Mckee Altered a Purchase Order to help reach the $5M quarter.**

12         McKee intentionally altered a purchase order received from Premier Components

13  Distribution ("Premier Components") and deleted conditions that were required by the customer

14  and which originally appeared on the face of the purchase order.

15         On June 21, 2006, Premier Components issued a purchase order for $182,280 and

16  faxed it to Tvia. However, the purchase order issued by Premier Components was made

17  conditional upon the following: (1) that the real customer, Celestica, would issue a purchase order

18  to Premier Components to cover the product that Premier Components was ordering from Tvia, and

19  (2) that Premier Components would have a right to return the products to Tvia should Celestica

20  cancel the order. McKee was trying to obtain credit for the Celstica order in the June quarter even

21  though Celstica was not ready for the shipment.

22         In the original purchase order issued by Premier Components, the two conditions

23  appear on the face of the document. In an e-mail, McKee informed Brittney Pan, a sales support

24  employee, that she should be receiving the PO. McKee then shows concern about the conditions

25  which are on the face of the document: "From what it sounds like they put the non cancel on the

26  front please send me a scan once you get it so I can figure out how creative I need to be."

27  Pan then sent McKee the PO, which shows the two conditions, via an e-mail attachment.

28         After receiving the PO, McKee states: "I will work on this and fax it back it to you."

1    Approximately 2 hours later, McKee faxed a revised PO to Pan. In answer to Pan's question about

2    what happened, McKee explained in an e-mail to Pan: "Yes the PO is revised. See there is no

3    condition now."

4           On June 27, 2006, McKee realized that the part number was incorrect, and so he had

5    Premier Components issue a new PO simply to correct that mistake. In the Sales Order records of

6    the Company, the PO does not have the conditions and the date under the signature is also missing.

7    The area where the conditions should have appeared has a smudge mark that is common after the

8    application of "white out." The copy of the PO in the records of Premier Components shows the

9    two conditions on the face of the PO and is dated June 27, 2006. These items do not appear on the

10   PO that was originally provided to the Company by McKee.

11          The Company is informed and believes that the conditions were intentionally deleted

12   by McKee so that he could claim credit for the sale and reach the $5 million quarter. As McKee

13   himself previously stated, he would do "anything it takes" to get his stock option bonus. Given that

14   the $182,280 purchase order was intentionally altered to conceal the two conditions, it should not

15   have been recognized as revenue for the quarter ended June 30, 2006.

16          **61. The sales team's extra options vested because of the $5 million quarter.**

17          As a result of seeming to post a $5 million quarter, the performance options that

18   were granted to the sales team were mistakenly believed to have vested. Consequently, the

19   Company mistakenly believed that the options could be exercised and sold at $1.39 per share.

20          As a result, an additional 70,000 options were mistakenly believed to have vested for

21   Silva, an additional 20,000 options were mistakenly believed to have vested for Wang, and an

22   additional 20,000 options were mistakenly believed to have vested for McKee. An additional

23   20,000 "phantom" options (cash settled bonus) were mistakenly believed to have vested for

24   Buttrick. Meanwhile, with the announcement of the $5 million quarter, the Company's stock price

25   climbed to nearly $4.00 per share as earlier predicted by McKee.

26   / / /

27   / / /

28   / / /

## MISAPPLICATION OF DATAVISION'S PAYMENT

### 62. Wang convinced Datavision to make a $200,000 deposit.

On June 29, 2006, Wang entered into an undisclosed side agreement with Datavision that provided for a deposit of $200,000 to be used against a future purchase order. If Datavision could not issue a purchase order for Tvia chips or identify a customer project to consume the products by August 31, 2006, then Tvia would refund the money paid by Datavision. Wang concealed this agreement from the Company and instead worked with Silva to divert the money to cover the accounts of earlier sham transactions.

### 63. Datavision's money was applied to the EUT and MPEG accounts.

On June 29, 2006, Silva writes to Bjorkstrom: "There is a wire coming i[n] for $200K from Data International (Datavision's parent company). $165K is applied to EUT, $45K applied to MPEG…. (Both companies can only wire so much and must use a third party. In this case it is Data International)." In response to request for confirmation, Bjorkstrom responds: "Yes that is the correct application!" See Exhibit A (Transaction Chart 3).

### 64. Datavision later claimed a $200,000 refund from Tvia.

By the end of August 2006, Datavision had no customer for the chips and so opted for a refund. However, the Datavision funds had already been applied to the accounts of EUT and MPEG as described above. As a result, Silva and Wang had to scramble to get money to Datavision. Silva and Wang arranged for repayment of $85,000 from Fu Cheong, and so Datavision currently claims $115,000 is due from Tvia. ($50,000 of the repayment via Fu Cheong came from a company called Up-Today as described below. See Exhibit A (Transaction Chart 4). Another $35,000 came from a company called Advance Technology. See Exhibit A (Transaction Chart 5).

## MISAPPLICATION OF CHERNG-CHII'S PAYMENT

### 65. Silva and Wang obtained $100,000 from Cherng-Chii.

Similar to other manufacturers described above, Cherng-Chii committed money to become an authorized manufacturer of flat screen TVs using Tvia's design technology. On July 31, 2006, Cherng Chii wired $100,000 to the Company. However, Silva and Wang concealed Cherng-

1  chii as a customer of the Company.  Silva and Wang also concealed the side agreement with

2  Cherng-chii in which they promised to bring Cherng-chii manufacturing orders which would

3  consume the Tvia chips.

4       **66. Cherng-chii's money was applied to SAC's account.**

5       At Silva's direction, Cherng-Chii's money was applied to the SAC purchase order

6  (the same SAC purchase order that had previously been cancelled as described above).  See Exhibit

7  A (Transaction Chart 1).

8       **67. Cherng-chii later claimed a $100,000 refund from Tvia.**

9       Cherng-chii has claimed a $100,000 refund as a result of the failure of Tvia's board

10  design and the failure of Silva and Wang to follow through on manufacturing orders.

11                **MISAPPLICATION OF UP-TODAY'S PAYMENT**

12       **68. Wang convinced Up-Today to make a $200,000 deposit to Fu Cheong.**

13       Wang set up an arrangement whereby a company called Up-Today Industrial Co.,

14  Ltd. ("Up-Today") would make a deposit for $200,000 with Fu Cheong, creating a pro forma

15  invoice on behalf of Fu Cheong for that amount.

16       On September 28, 2006, Up-Today paid $201,600 to Fu Cheong.  However, Up-

17  Today did not receive any product at the time.  In order to get the money, Wang signed a document

18  purportedly on behalf of Tvia promising to sell Up-Today's inventory in three months at a

19  guaranteed price of $1 per unit profit for Up-Today.

20       **69. $50,000 of Up-Today's Money was sent to Datavision.**

21       In an effort to cover their tracks, Wang directed Fu Cheong to send $50,000 of Up-

22  Today's money to Datavision after Datavision requested a refund.  See Exhibit A (Transaction

23  Chart 4).

24       **70. $140,000 of Up-Today's money was applied to SFD's account.**

25       Per Silva's instruction, the balance of Up-Today's money was applied to SFD's

26  account and used to pay storage costs.  See Exhibit A (Transaction Chart 4).  On October 3, 2006,

27  Fu Cheong sent the Company a wire for $145,420 which Silva directed to be applied against the

28  SFD account.

**71. Up-Today later claimed a $200,000 refund from Tvia.**

Up-Today has claimed a $200,000 refund based on the side agreement that was signed by Wang in which Wang promised to sell the inventory.

**THE SALES TEAM SOLD STOCK ON INSIDE INFORMATION**

**72. By August 2006, the Company's stock settled at above $3.00 per share**

On August 7, 2006, the Company announced preliminary results that it had attained $5 million in revenue for the quarter ended June 30, 2006. The following day, based on the estimated revenue, the Company's stock traded as high as $3.75 per share.

**73. Only the sales team knew of the Company's artificially inflated revenue.**

Unbeknownst to the market, the revenue for the quarter, as well as the previous several quarters, was artificially inflated by the Sales Team's pervasive use of side agreements, misapplication of funds, altered purchase orders and other wrongdoing as described above. Though the information was unknown to the public, the entire sales team was aware of the information and they knew it was just a matter of time before the Company's stock price would collapse. Silva, McKee and Wang exercised their stock options and sold the Company's stock based on this non-public material information.

**74. Silva, McKee and Wang made $437,706.66 from stock option gains.**

On August 29, 2006, Silva exercised all of his vested stock options and sold all of his stock for a gain of $311,480. The sales price for Silva's shares ranged from $3.00 to $3.14 per share.

On August 30 and 31, 2006, McKee exercised all of his vested stock options and sold all of his stock for a gain of $97,225.91. The sales price for McKee's shares ranged from $3.10 to $3.15 per share.

On August 30 and 31, 2006, Wang exercised 15,000 stock options and sold these shares for a gain of $29,000. The sales price for Wang's shares ranged from $3.10 to $3.15 per share.

///

///

**75. Buttrick made $149,200 in cash-settled stock appreciation rights.**

On August 28, 2006 and October 13, 2006, the Company paid Buttrick $149,200 based on his exercise of the "phantom" stock option bonus. Essentially, the amount of the cash bonus for Buttrick was tied to the Company's stock price. The stock price fixed for Buttrick's bonus ranged from $3.00 to $3.45 per share.

**Q2 FY 2007**

**(Quarter ended September 30, 2006)**

**76.    Bjorkstrom gave instructions to create a sham transaction.**

Bjorkstrom directed a request to Fu Cheong to enter a contract so that revenue could be recognized before the September 2006 quarter end, despite the fact that the customer, MNK, did not want to purchase until October.

On September 27, 2006, Fu Cheong issued a purchase order in its own name to Tvia. MNK sent the real purchase order, requesting delivery of the product in October, to Fu Cheong. The order was re-routed through Fu Cheong for revenue recognition purposes.

**77.    Silva entered into an undisclosed side agreement with Fu Cheong.**

In order to convince Fu Cheong to place the purchase order with Tvia, Silva entered into a side agreement stating that Fu Cheong is not responsible for payment of the purchase order but will simply transfer payment from MNK.

**THE COLLAPSE**

**78. Bjorkstrom resigned.**

On October 4, 2006, Bjorkstrom submitted her resignation which became effective October 18, 2006. By the time of Bjorkstrom's resignation, the house of cards created by the Sales Team and perpetuated by Bjorkstrom began to collapse.

**79. The sham middleman stopped accepting shipments.**

By the fall of 2006, the Sales Team had exhausted its supply of companies who were willing to accept shipments and issue purchase orders based on side agreements. As a result, the revenue for the quarter ended September 30, 2006, fell way below the Company's projections. In

1  addition, the Sales Team also could not obtain any more deposits from new customers to cover the

2  earlier sham transactions, so the aging receivables began to look more and more like bad debt.

3          On November 22, 2006, the Company filed a restatement which deferred millions of

4  previously stated revenue for the quarters ended June 30, 2006, and March 31, 2006, and December

5  31, 2005. As a result, additional costs of the restatement from outside auditors and legal fees were

6  incurred by the Company.

7          At this point, the Company was still in the dark about the side agreements, the

8  misapplication of funds to the sham middlemen and other wrong doing by the sales team.  While

9  preparing the restatement, the Company asked the Sales Team directly about the existence of any

10  side agreements. The Sales Team, including Silva, provided written denials regarding the existence

11  of any side agreements. In addition, the Sales Team coached the sham middlemen not to disclose

12  the side agreements to the Company's CEO and new CFO who was working with the auditors on

13  the restatement. As a result, the aging receivables were mistakenly viewed by the Company to be

14  the result of a negative change in market conditions.

15         **80. Silva resigned.**

16          On January 18, 2007, Silva resigned from the Company.

17         **81. The subsequent investigation cost was approximately $1.5 million.**

18          Following Silva' resignation, the Company discovered a reference to one of the side

19  agreements in an e-mail that was sent to Silva's e-mail account. The Audit Committee of the

20  Company's Board of Directors initiated an investigation utilizing outside counsel and forensic

21  auditors. The cost of the investigation that was incurred by the Company was approximately $1.5

22  million. In addition, an anticipated second restatement of the Company's revenues would cost even

23  more.

24         **82. The sham middlemen returned more than 1 million units of inventory.**

25          During the investigation, the Company discovered more than 1 million units of

26  inventory being stored with the sham middlemen. This huge volume of inventory had been

27  stockpiled by the Sales Team and claimed by the Sales Team to be legitimate sales. Since the

28

1   resignation of Silva and the termination of the Sales Team, most of this inventory has now been
2   returned to the Company.

3           **83. The Company's stock has dropped to approximately $0.04 per share.**

4           By the time all of the wrongdoing was disclosed, the Company's stock price dropped
5   to approximately $0.04 per share and the Company's stock was delisted from NASDAQ.

6                   **THE OVERPAYMENT OF COMMISSIONS AND BONUSES**

7           **84. The sales team was overpaid by more than $1 million.**

8           Every quarter, the former sales team perpetuated a fraud on Tvia regarding the
9   collective quarterly sales numbers. Per the agreements with the sales team, no commissions were
10  paid unless the sales team met 75% of the quarterly sales plan. The sales team used the side
11  agreements described above to inflate the reported sales revenue for each quarter and make it
12  appear that the quota was reached when in fact the quotas were never reached and no commissions
13  were ever really due. As a result of the illegal and fraudulent side agreements, the Company
14  mistakenly paid the Sales Team more than $1 million in commissions and bonuses which were not
15  really owed.

16          During 2005 and 2006, Silva was wrongfully paid $287,823.26, Wang was
17  wrongfully paid $206,858.06, McKee was wrongfully paid $170,412.57, and Buttrick was
18  wrongfully paid $366,951.17.

19          **85. McKee continued to stuff the channel to set up a false commission claim.**

20          In January 2007, knowing that the house of cards was collapsing, McKee engaged in
21  a plan to "stuff the channel" with as many fraudulently inflated orders as possible in order to set up
22  a false claim for commissions. After his termination in April 2007, McKee filed a false claim for
23  $74,735.15 in back commission wages. McKee had bragged that he had previously won a case
24  against a former employer for commission wages, and so McKee knew which "paperwork" he
25  needed to submit a false claim, even if the customer did not really want to commit to the order.
26  McKee essentially had customers submit forecasts on a piece of paper which was labeled as a P.O.
27  These were regular customers of Tvia, but the customers did not want to commit to any delivery
28  dates and wanted the option to back out of the deal if their demand fell flat.

1    In keeping with the sales team's practice of improper side agreements, McKee told
2    customers that they could change the delivery dates and, in some cases, did not have to commit to a
3    delivery date at all. Simply by putting an estimate of the year's orders down on a piece of paper,
4    McKee has attempted in bad faith to secure commissions on the forecasts even though there was no
5    enforceable agreement with the customers. This scheme was consistent with the past side
6    agreements which were used fraudulently to claim completed sales.

7    **86. Commissions for third parties were not deducted.**

8    In addition to the foregoing, McKee personally gained more than $100,000 in
9    commissions which should not have been paid because of deductions of commissions paid to third
10   parties. McKee's employment contract clearly provides that McKee's commissions would be
11   reduced in the amount of commissions that had to be paid to any third party for any particular sale.
12   The purpose of the deduction was to cap the total commissions paid by Tvia on any single
13   transaction at a maximum of 7%. McKee's initial commission summaries show that these
14   deductions were made properly at the beginning.

15   However, in approximately September 2005, McKee conspired with Bjorkstrom and
16   Silva to secretly eliminate this deduction without approval from Tvia's CEO who was the only
17   officer with authority over McKee's salary.

18   McKee, Silva and Bjorkstrom arranged for the deduction of the third party
19   commission from the price paid by the customer instead of directly from McKee's commission.
20   This payment to McKee clearly contradicts the terms of McKee's written employment contract.
21   The incorrect calculation resulted in nearly a double commission being paid by the Company to
22   McKee. These double commissions amount to more than $100,000, all of which was improperly
23   and secretly paid to McKee by Bjorkstrom. Silva, Wang and Buttrick were similarly overpaid
24   based on Bjorkstrom's failure to properly deduct commissions paid to third parties.

25   / / /
26   / / /
27   / / /
28   / / /

1

## FIRST CAUSE OF ACTION

2

### (Insider Trading)

3

### (Against all Defendants)

4   87. Plaintiff hereby re-alleges paragraphs 1 through 86 as though fully set forth

5   herein.

6   88. Silva, McKee and Wang, and each of them, by reason of their positions and

7   relationship with the Company, had access to material inside information about the Company

8   relating to the undisclosed side agreements, misapplication of funds, altered purchase orders, and

9   other wrongdoing by the Sales Team which resulted in artificial and overstated revenues for the

10  Company, and which information was not generally available to the public.

11  89. On or about August 29, 2006, August 30, 2006, and August 31, 2006, Silva,

12  McKee and Wang, and each of them, sold securities of the Company in this state when they knew

13  that their inside information about the Company, which was not generally available to the public,

14  would significantly affect the market price of the Company's securities.

15  90. At the time of their sale of the Company's securities as alleged above, Silva,

16  McKee and Wang, and each of them, did not have any reason to believe the person or persons

17  buying from them were also in possession of the information.

18  91. By reason of the foregoing, defendants Silva, McKee and Wang, and each of

19  them, have violated California Corporations Code Section 25402 by selling the Company's

20  securities on inside information.

21  92. Pursuant to California Corporations Code Section 25502.5, the Company is

22  entitled to damages in amount up to three times the difference between the price at which the

23  securities were sold and the market value which the security would have had at the time of the sale

24  if the information known to the defendants had been publicly disseminated prior to that time and a

25  reasonable time had elapsed for the market to absorb the information.

26  93. By the time all of the wrongdoing by the Sales Team had been disclosed by the

27  Company, and a reasonable time had elapsed for the market to absorb the information, the

28  Company's stock was trading at approximately $0.04 per share.

1

**Silva's individual liability for Insider Trading is $1,782,186**

2   94. On August 29, 2006, and August 30, 2006, Silva sold 200,000 shares of the

3   Company's stock for an aggregate sales price of $602,062.00. The market value of the stock after

4   disclosure and absorption of the information amounts to $0.04 per share or $8,000. The difference

5   between (1) the sales price, and (2) the market value after disclosure and absorption of the

6   information, equals $594,062. Pursuant to section 25502.5, Silva is liable to the Company for

7   damages three times that amount which is: $1,782,186.00.

8

**McKee's individual liability for Insider Trading is $516,112.53**

9   95. On August 30, 2006, and August 31, 2006, McKee sold 55,416 shares of the

10   Company's stock for an aggregate sales price of $174,254.15. The market value of the stock after

11   disclosure and absorption of the information amounts to $0.04 per share or $2,216.64. The

12   difference between (1) the sales price, and (2) the market value after disclosure and absorption of

13   the information, equals $172,037.51. Pursuant to section 25502.5, McKee is liable to the Company

14   for three times that amount which is: $516,112.53.

15

**Wang's individual liability for Insider Trading is $139,200**

16   96. On August 30, 2006, and August 31, 2006, Wang sold 15,000 shares of the

17   Company's stock for an aggregate sales price of $47,000. The market value of the stock after

18   disclosure and absorption of the information is $0.04 per share or $600.00. The difference between

19   (1) the sales price, and (2) the market value after disclosure and absorption of the information,

20   equals $46,400. Pursuant to section 25502.5, Wang is liable to the Company for damages three

21   times that amount which is: $139,200.00.

22   97. The Company is entitled to bring an action under Section 25502.5 because at all

23   relevant times herein the Company had assets in excess of $1,000,000 and had a class of equity

24   security held by 500 or more persons.

25   98. All of the defendants, and each of them, are jointly and severally liable for the

26   damages attributed individually to Silva, McKee and Wang, in this cause of action, as each of the

27   defendants participated in, aided, abetted and engaged in a conspiracy in furtherance of, the

28

1    unlawful insider trading as alleged above, the last overt act being the sale of the Company's

2    securities.

3          99. Plaintiff is informed and believes, and thereon alleges, that the conduct of

4    defendants as described above was malicious, fraudulent and oppressive, undertaken in conscious

5    disregard of plaintiff's rights, thereby entitling plaintiff to an award of punitive or exemplary

6    damages to be determined at trial.

7                     **SECOND CAUSE OF ACTION**

8                  **(Breach of Fiduciary Duty of Loyalty)**

9                    **(Against all Defendants)**

10         100. Plaintiff hereby re-alleges paragraphs 1 through 99 as though fully set forth

11    herein.

12         101. By reason of their positions as officers, employees and agents of the Company,

13    the defendants, and each them, owed the Company a fiduciary duty of loyalty which precluded

14    them from placing their own interests, or the interests of others, above the interests of the Company

15    in the course of and in the execution of their duties.

16         102. By reason of their actions and omissions as alleged above, the defendants and

17    each of them have violated their fiduciary duty of loyalty in that they took actions to benefit

18    themselves and each other at the expense of the Company, resulting in (1) the improper and

19    mistaken payment of commissions and bonuses to the Sales Team in the amount of approximately

20    $1 million and (2) the investigation costs of approximately $1.5 million which were incurred by the

21    Company.

22         103. As a direct, legal and proximate result their breach of the fiduciary duty of

23    loyalty, the Company has suffered damages in the amount of approximately $2.5 million.

24         104. All of the defendants, and each of them, are jointly and severally liable for the

25    damages attributed individually to any single defendant in this cause of action, as each of the

26    defendants participated in, aided, abetted and engaged in a conspiracy in furtherance of, the breach

27    of the fiduciary duty of loyalty as alleged above, the last overt act being the illegal, unjust and

28    mistaken payment of commissions and bonuses to the Sales Team.

1    105. Plaintiff is informed and believes, and thereon alleges, that the conduct of

2   defendants as described above was malicious, fraudulent and oppressive, undertaken in conscious

3   disregard of plaintiff's rights, thereby entitling plaintiff to an award of punitive or exemplary

4   damages to be determined at trial.

5                              **THIRD CAUSE OF ACTION**

6                              **(Breach of Fiduciary Duty of Care)**

7                                 **(Against all Defendants)**

8    106. Plaintiff hereby re-alleges paragraphs 1 through 105 as though fully set forth

9   herein.

10   107. By reason of their positions as officers, employees and agents of the Company,

11  the defendants, and each them, owed the Company a fiduciary duty of care which required them to

12  exercise their authority and undertake their actions in the course of and in the execution of their

13  duties with due care and in accordance with the Company's internal policies.

14   108. By reason of their actions and omissions as alleged above, the defendants and

15  each of them have violated their fiduciary duty of care, in that they deliberately in engaged in

16  conduct without the requisite level of care required for their positions and in direct violation of

17  Company policies, resulting in (1) the improper and mistaken payment of commissions and bonuses

18  to the Sales Team in the amount of approximately $1 million and (2) the investigation costs of

19  approximately $1.5 million which were incurred by the Company.

20   109. As a direct, legal and proximate result their breach of the fiduciary duty of

21  care, the Company has suffered damages in the amount of approximately $2.5 million.

22   110. All of the defendants, and each of them, are jointly and severally liable for the

23  damages attributed individually to any single defendant in this cause of action, as each of the

24  defendants participated in, aided, abetted and engaged in a conspiracy in furtherance of, the breach

25  of the fiduciary duty of care as alleged above, the last overt act being the illegal, unjust and

26  mistaken payment of commissions and bonuses to the Sales Team.

27   111. Plaintiff is informed and believes, and thereon alleges, that the conduct of

28  defendants as described above was malicious, fraudulent and oppressive, undertaken in conscious

1 | disregard of plaintiff's rights, thereby entitling plaintiff to an award of punitive or exemplary

2 | damages to be determined at trial.

3 | **FOURTH CAUSE OF ACTION**

4 | **(Fraud)**

5 | **(Against all Defendants)**

6 | 112. Plaintiff hereby re-alleges paragraphs 1 through 111 as though fully set forth

7 | herein.

8 | 113. By reason of their actions and omissions as alleged above, the defendants and

9 | each of them have committed fraud against the Company, in that they intentionally misrepresented

10 | and concealed material facts as alleged above, resulting in the improper and mistaken payment of

11 | commissions and bonuses to the Sales Team in the amount of approximately $1 million and (2) the

12 | investigation costs of approximately $1.5 million which were incurred by the Company.

13 | 114. The Company reasonably relied on the false representations of the defendants,

14 | and did not unreasonably ignore any facts, because the defendants were the employees and agents

15 | of the Company with whom the Company had a relationship of trust and confidence.

16 | 115. As a direct, legal and proximate result of the fraud by defendants, the

17 | Company has suffered damages in the amount of approximately $2.5 million.

18 | 116. All of the defendants, and each of them, are jointly and severally liable for the

19 | damages attributed individually to any single defendant in this cause of action, as each of the

20 | defendants participated in, aided, abetted and engaged in a conspiracy in furtherance of, the fraud as

21 | alleged above, the last overt act being the illegal, unjust and mistaken payment of commissions and

22 | bonuses to the Sales Team.

23 | 117. Plaintiff is informed and believes, and thereon alleges, that the conduct of

24 | defendants as described above was malicious, fraudulent and oppressive, undertaken in conscious

25 | disregard of plaintiff's rights, thereby entitling plaintiff to an award of punitive or exemplary

26 | damages to be determined at trial.

27 | ///

28 | ///

31
COMPLAINT

1

## FIFTH CAUSE OF ACTION

2

### (Unjust Enrichment)

3

### (Against defendants Silva, Wang, McKee and Buttrick)

4          118.  Plaintiff hereby re-alleges paragraphs 1 through 117 as though fully set forth

5     herein.

6          119.  By reason of the foregoing, defendants Silva, Wang, McKee and Buttrick were

7     unjustly enriched in the approximate amount of $1 million as the result of mistaken commission

8     and bonus payments made by the Company to these defendants.

9          120.  As a direct, legal and proximate result of their unjust enrichment, justice

10    requires that these defendants pay restitution to the Company in the approximate amount of $1

11    million.

12                              **PRAYER FOR RELIEF**

13          WHEREFORE, Plaintiff seeks judgment against each of the defendants, jointly and

14    severally, for the following:

15          1.  Statutory damages in the approximate amount of $2.4 million pursuant to

16    California Corporations Code Section 25502.5;

17          2.  Compensatory damages in the approximate amount of $2.5 million;

18          3.  Restitution in the approximate amount of $1 million;

19          4.  Punitive Damages;

20          5.  Costs of Suit;

21          6.  Reasonable attorney's fees pursuant to statute;

22          7.  Any other relief the court deems just and proper.

23

24    Dated: _Feb. 5, 2008_                    Respectfully submitted,

25

26                                            Jefferson T. Stamp
                                              Attorney for Plaintiff
27                                            TVIA, INC.

28

COMPLAINT

Recycled Paper 



2006.06.29

**TVIA HF**

| QTY | Amount |
|---|---|
| 40000 | $300,000.00 |

TV5600BF 40,000PCS @ $7.50
Amount: $300,000.00

SO: 0606-031

**SAC**

| QTY | Amount |
|---|---|
| 40000 | $300,000.00 |

2006.06.30
SAC Request to **hold** this shipment,
but shipment has been done

2006.07.
SAC received chips and said need return
Per Ben's instruction return to Fucheong

**SAC invertory in Fucheong**

| QTY | Amount |
|---|---|
| 40000 | $300,000.00 |

RMA0307-008 back 26,720 pcs balance$200,400.00

Per Ben's instruction AR Applied to SAC $100,000.00

2006.08.

Per Ben and Steve, Cherng
Chii buy chips from SAC in
Fucheong warehouse

**TVIA**

| QTY | Amount |
|---|---|
| | $100,000.00 |

Chery Chii pay $100,000.00
for 12800pcsTV5600BF @ $7.80

Paid $100,000.00

**Chery Chii**

| QTY | Amount |
|---|---|
| 12800 | $100,000.00 |

Chart1



2005

**TVIA HF**

| QTY | Amount |
|-----|--------|
| 10000 | $65,000.00 |

Sale TV5600AQ (10000pcs.@$6.5)
For TTE project

**MPEG**

| QTY | Amount |
|-----|--------|
| 10000 | $65,000.00 |

2005.10.

Per Ben's instruction,transfer
TV5600AQ(10000pcs,@$6.5) to Ricom
Due to TTE project failed

**Ricom(Fucheong)**

| QTY | Amount |
|-----|--------|
|     | $65,000.00 |

Per Ben's instruction AR Applied to MPEG $65,000.00

**TVIA**

| QTY | Amount |
|-----|--------|
|     |        |

payment

5 Payment detail

|           | SO#      | Date      | Amount |
|-----------|----------|-----------|--------|
| TSE SO WA | 0605-023 | 13/Oct/05 | $4,985.00 |
| Fucheong  | 0605-023 | 13/Oct/05 | $9,982.00 |
| Cheng XinMin | 0605-023 | 12/Oct/05 | $8,183.00 |
| Fucheong  | 0605-023 | 3/Oct/05  | $9,982.00 |
| TSE SO WA | 0605-023 | 3/Oct/05  | $29,982.00 |
|           |          | Total:    | $63,114.00 |

Chart2



2006.05.

| TVIA HF | |
|---|---|
| QTY | Amount |
| 15000 | $97,500.00 |

SO#0605-025

| MPEG | |
|---|---|
| QTY | Amount |
| 15000 | $97,500.00 |

TV5600AQ @ $6.5
Per Ben's instruction
Transfer to Ricom

| Ricom(Fucheong) | |
|---|---|
| QTY | Amount |
| | |

Per Ben's instruction
AR Applied to MPEG $53,000.00

Per Ben's instruction
AR Applied to MPEG $45,000.00

Paid $45,000.00

| DATA | |
|---|---|
| QTY | Amount |
| | $53,000.00 |
| | $147,000.00 |
| Total: | $200,000.00 |

Paid $200,000.00

| TVIA | |
|---|---|
| QTY | Amount |
| | $200,000.00 |
| | $45,000.00 |
| Total: | $245,000.00 |

Per Ben's instruction AR Applied to EUT $147,000.00

| EUT | |
|---|---|
| QTY | Amount |
| | $147,000.00 |

Chart3



Chart4



| EUT | |
|---|---|
| QTY | Amount |
| 8400 | $75,600.00 |

TV5600BF RMA
Return to TVIA

| TVIA HF | |
|---|---|
| QTY | Amount |
| | |

RMA return to EUT

| EUT in Fucheong | | |
|---|---|---|
| PART No. | QTY | Amount |
| TV5715 | 19546 | |
| CP5055 | 270 | |
| | TOTAL: | $75,600.00 |

Sold

Paid

| AdvanceTech | |
|---|---|
| PART No. | QTY |
| TV5715 | 19546 |
| CP5055 | 270 |

Paid $20,945.00

| DATA | |
|---|---|
| QTY | Amount |
| | |

Paid $35,000.00 as EUT pay back
(before DATA paid for EUT $147,000.00)

| TVIA | |
|---|---|
| QTY | Amount |
| | $20,945.00 |

Per Ben's instruction
AR Applied to EUT $20,945.00

**Chart5**



End of 2006.09.

**MJL**

| QTY | Amount |
|---|---|
| 10000 | $110,000.00 |

$34,524.00
Chart 8
$40,000
Chart 9

Per Mike & Ben's instruction
Ship TV5600BF @ $11.00 to Fucheong

**Fucheong**

| QTY | Amount |
|---|---|
| 3300 | |
| 6700 | |
| *10000* | |

2007.03
RMA0307-017
3300 pcs

**TVIA HF**

| QTY | Amount |
|---|---|
| 3300 | |

6700 pcs TV5600BF
stay in Fucheong

Balance MJL AR

**MJL**

| QTY | Amount |
|---|---|
| | |

Chart6



EUT

| QTY | Amount |
|-------|--------|
| 800 | |
| 12960 | |

_13760_

800 pcs TV5600BF belong to Up-Today
12960 pcs TV5600BFNeed return back to TVIA HF

TVIA HF

| QTY | Amount |
|-------|--------|
| 12960 | |

TVIA

TBD

DATA

| QTY | Amount |
|-----|--------|
| | |

TVIA will pay back $115,00.00

Chart7



Chart8



Chart9



Chart10



Per email TVIA let Ricom place PO to TVIA
SO#0605-041/042

Paid $600.00 commission
for forward these 2 shipments

Applied $14,750.00 to Ricom

Paid $14,750.00

shipped 50 pcs of 5050STB

2 Shpment to INTRALASE
shipped 38 pcs of 5050STB @ $295.00
shipped 12 pcs of 5050STB @ $295.00

| Ricom | |
|---|---|
| QTY | Amount |
| | |

| TVIA | |
|---|---|
| QTY | Amount |
| 50 | $14,750.00 |

| Fucheong | |
|---|---|
| QTY | Amount |
| 50 | $14,750.00 |

| INTRALASE | |
|---|---|
| QTY | Amount |
| 38 | $11,210.00 |
| 12 | $3,540.00 |

Chart11

**Exhibit 2**

FILE**DCS** 

| SUPERIOR COURT, STATE OF CALIFORNIA COUNTY OF SANTA CLARA DEPARTMENT 7 191 North First Street, San Jose, CA 95113 408.882.2170 · 408.882.2193 (fax) civildiscoverytentatives@scscourt.org http://www.sccsuperiorcourt.org | 08 JAN 11 AM 11:09 CHIEF E. . . ./CLERK SUPE. . . F CA COUNT . . . CLARA BY A. Ilas . . . PUTY (For clerk's use only) |
| --- | --- |

Click here to contest this tentative ruling by email

**TVIA, INC. v. NBG, LLC et al.**
Date: 11 January 2008                Time: 10:00 a.m.

Case No.: 1-07-CV-084211
Line Number: 12

This matter will be heard by the Honorable Judge Socrates Peter Manoukian in Department 7 in the Downtown Superior Courthouse, 3rd Floor, 191 North First Street, San Jose. Any party opposing the tentative ruling must call Department 7 at 408.882.2170 and the opposing party no later than 4:00 PM on Thursday 10 January 2008.

The Motion of Defendants Benjamin Silva ("Silva"), Matthew McKee ("McKee"), Tsu Hsien "Steve" Wang ("Wang"), and Wei Chen ("Chen") (collectively referred to as "Defendants") to Quash Subpoenas (Second Set), and the motion of Plaintiff Tvia, Inc. ("Plaintiff") to Compel Wang's Deposition and Production of Documents at Deposition came on regularly for hearing before the Honorable Socrates Peter Manoukian on 11 January 2008, at 10:00 a.m. in Department 7. The matter having been submitted, the Court finds and orders as follows:

## BACKGROUND

This is a case involving allegations of trade secret theft, unfair competition, breach of contract, and actual fraud. Plaintiff is a fab-less semiconductor company that designs, produces, and markets display processors. Among Plaintiff's products are chips designed for high-definition LCD televisions. Plaintiff asserts that Defendants NBG, LLC ("NBG") and Synett, together with former Tvia employees Silva, McKee, Wang, and Chen, stole one of Plaintiff's business deals and used Plaintiff's trade secrets to manufacture certain televisions. According to Plaintiff, on 10 November 2006, it executed a purchase contract with Qibee, Inc. ("Qibee"), and that Qibee signed a purchase order for 840 LCD televisions. A second purchase agreement for 8,160 televisions was made on 22 January 2007. Pursuant to the terms of the Qibee purchase order, Plaintiff obtained certification from Underwriters Laboratory ("UL"), as well as an authentication from the Federal Communications Commission ("FCC").

Plaintiff claims that on 27 March 2007, Defendants "stole" the second sale with Qibee by selling Plaintiff's products to Qibee. In support of these allegations, Plaintiff cites correspondence between Wang and NBG's corporate officers. These communications include a 27 February 2007 letter between NBG's officers, which suggests NBG's authorization that funds be wired directly to Wang's account. Plaintiff also asserts that the televisions delivered by NBG bear Plaintiff's UL and FCC authentication numbers. Finally, Plaintiff claims that Silva was "involved in a phony letter of credit" regarding the Qibee deal.

## DISCOVERY DISPUTE

Plaintiff issued Deposition Subpoenas For Production of Business Records to several banking institutions, Qibee, Inc. ("Qibee"), and SBC Pacific Bell. Defendants moved to quash the subpoenas, except for those issued to Qibee and Bank of America. Defendants argue that the subpoenas are not reasonably particularized and that Plaintiff's requests violate their fundamental right to privacy in their financial records. Plaintiff argues that it has sought relevant information and that it had adequately specified its requests.

Plaintiff claims, and Wang does not dispute, that Wang refused to appear for a deposition. Plaintiff moved to compel Wang's deposition, asserting that he had not timely filed a written objection to the deposition. Wang claims that an objection was in fact filed. He states that he is currently in China, and argues that pursuant to CCP § 2025.260, several factors, including the expense to the parties and the available alternatives, are to be weighed

when determining whether a deposition of a party at a place more distant than permitted under CCP § 2025.250.[10] Wang further claims that Plaintiff failed to meet and confer with respect to the factors set forth in this code section, particularly Wang's request that Plaintiff pay travel expenses associated with any deposition appearance in the United States. Plaintiff replies by pointing out that Wang's Opposition was not timely filed, and that because Wang is in fact a resident of Saratoga, he should be compelled to submit to a deposition in this county. (CCP § 2025.250.) In the alternative, Plaintiff requests that the Court compel a deposition in this county "in the interest of justice" under CCP § 2025.260. Finally, Plaintiff requests that the Court admonish defense counsel for his conduct during Defendant Chen's deposition.

## DISCUSSION

### I.    Defendants' Motion to Quash Subpoenas (Second Set) is Granted in Part and Denied in Part.

CCP §1987.1 authorizes a party to bring a motion to "quash a subpoena entirely, modify[] it, or direct compliance with it upon such terms or conditions as the court shall declare. ...In addition, the court may make any other order as may be appropriate to protect the parties, the witness, or the consumer from unreasonable or oppressive demands including unreasonable violations of a witness's or consumer's right of privacy." The burden is on the party seeking disclosure of information protected by privacy rights to show direct relevance and a particularized need for the confidential information sought. (Weil & Brown, *California Practice Guide: Civil Procedure Before Trial* (Rutter Group 2007) at ¶¶8:320, et seq.) Personal financial records fall within the zone protected by the right of privacy. (Cobb v. Sup.Ct. (1979) 99 Cal.App.3d 543, 550.) When the right of privacy is triggered, the party seeking discovery must show that the requested information is directly relevant to an issue in the case. (Britt v. Sup. Ct. (1978) 20 C.3d 844, 859-862.) Direct relevance means that the information must be essential to determining the truth of the matters in dispute. (Id.) "When compelled disclosure intrudes on constitutionally protected areas, it cannot be justified solely on the ground that it may lead to relevant information." (Bd. of Trustees v. Sup. Ct. (1981) 119 Cal.App.3d 516, 525.) The court should consider the purpose of the information sought, the effect of disclosure, the nature of the objections, and the possibility of an alternative order. (Valley Bank of Nevada v. Sup. Ct. (1975) 15 Cal. 3d 652, 657.) Furthermore, discovery will not be ordered if the information sought is available from other sources or through less intrusive means. (Allen v. Sup.Ct. (1984) 151 Cal.App.3d 447, 449.)

### A.    The to Quash Subpoenas for Information Pertaining to Triet Silva, Diane Bjorkstrom, and the Bank Accounts Associated with these Individuals is Granted.

The motion is granted with respect to the requests for information pertaining to Triet Silva and the Washington Mutual account associated with her. The motion to quash is also granted with respect to the requests for writings pertaining to Diane Bjorkstrom and the Citibank account associated with her. Plaintiff makes no allegation with respect to these individuals and has not explained what role, if any, they played in the scheme alleged to have been carried out by Defendants. As such, Plaintiff has failed to demonstrate the direct relevance of Ms. Silva's and Ms. Bjorkstrom's financial records. For these reasons, the motion to quash subpoenas for information regarding Triet Silva's and Diane Bjorkstrom's personal finances is GRANTED.

### B.    The Motion to Quash Subpoenas for Information Regarding Defendants' Personal Finances, Tvia and Qibee, and Plaintiff's Products.

The information sought by Plaintiff is directly relevant to the allegations it makes against Defendants. Plaintiff has asserted that Wang, Silva, Chen, and McKee "stole" the second Qibee sale from Plaintiff and used Plaintiff's trade secrets to manufacture and sell televisions. Plaintiff maintains that the information sought is relevant to the pending litigation, since "Defendants used personal bank accounts to avoid local taxes, steal Tvia's customers and trade secrets, and manufacture counterfeit products." (Plaintiff's Points & Authorities in Support of Opposition to Motion to Quash, 8:27-28.) Accordingly, information pertaining to the Defendants' finances is directly relevant, both to the issue of liability and to damages. Furthermore, given the nature of the scheme alleged by Plaintiff,

---

[10] "Unless the court orders otherwise under Section 2025.260, the deposition of a natural person, whether or not a party to the action, shall be taken at a place that is, at the option of the party giving notice of the deposition, either within 75 miles of the deponent's residence, or within the county where the action is pending and within 150 miles of the deponent's residence." (CCP § 2025.250(a).)

writings related to any agreements or contracts with Qibee and Tvia, as well as writings related to the purchase, sale, shipment, or delivery of 42" HD LCD televisions are directly relevant. This information may, for example, reveal the existence of any competing venture formed by Defendants, as well as the extent to which Plaintiff's ideas may have been incorporated by Defendants.

Moreover, while Defendants argue that "there is no way a bank would have access to contracts or be able to make distinctions based on products," (Points & Authorities In Support of Motion to Quash, 3:3-13), it is for the custodians of records, not Defendants, to raise this argument. At this time, no such claim has been raised by the custodians.

Finally, given the nature of Plaintiff's claims, the subpoenas are directed at appropriate parties including the banks at which Defendants maintained the personal accounts used to carry out the alleged scheme against Plaintiff; Qibee, the customer allegedly stolen from Plaintiff; and SBC Pacific Bell.[11] Thus, contrary to Defendants' assertions, there is no less intrusive means for Plaintiff to obtain information of the kind and quality needed to pursue its claims. In sum, Plaintiff's need for the information sought outweighs the intrusion into the involved individuals' financial records. For these reasons, Defendants' Motion to Quash the Subpoena for information pertaining to Defendants' personal finances, for documents pertaining to Qibee and/or Tvia, and for documents referencing 42" HD LCD televisions is DENIED.

Plaintiff has pointed out that a Stipulated Protective Order Regarding the Use of Confidential Information was entered on 3 May 2007. The parties are ordered to meet and confer regarding a stipulation to modify the existing order to include information disclosed pursuant to these subpoenas.

Finally, Defendants suggest that the Court conduct an in camera review of the records disclosed pursuant to the subpoenas. In light of the protective order, and because the Court has quashed the subpoena for confidential financial that is not directly relevant to the pending litigation, no in camera review of the documents is necessary.

II.    Plaintiff's Motion to Compel Wang's[12] Deposition and Productions of Documents at Deposition is Granted.

Any party may obtain discovery by deposition in California of any person, including any party to the action, within the scope of discovery delimited by CCP § 2017 and subject to restrictions as to frequency and timing set forth in CCP § 2019. (CCP § 2025.010.) If, after service of a deposition notice, the party fails to appear for examination without having served a valid objection under CCP §2025.410, the party giving the deposition notice may move for an order compelling the deponent's attendance and testimony, and for a monetary sanction under CCP §2023. (CCP § 2025.450; Weil & Brown, at ¶¶ 8:825-8:830.) When the deponent fails to attend the deposition, the notice of motion shall be accompanied by a declaration stating that the petitioner has contacted the deponent to inquire about the nonappearance. (CCP § 2025.450(b) (2).)

Wang concedes that his Opposition was not timely filed, pursuant to CCP § 1005(b). (Errata to Supp. Decl. in Support of Opposition to Motion to Compel, ¶ 2.) The Court notes that Plaintiff filed a timely and thorough Reply, and finds that the Opposition's tardiness resulted in no significant prejudice to Plaintiff. The Court will therefore consider the untimely Opposition.

As evidenced by the 12 November 2007 transcript attached to the supplemental declaration in support of Plaintiff's motion to compel, the parties have met and conferred regarding Wang's deposition. The excerpt of the transcript offered by Plaintiff indicates Wang's refusal to give a direct answer about his willingness to attend a deposition in the United States. (Healy Supp. Decl. re: Motion to Compel, Ex. 3.)

Plaintiff asserts that no written objection to the notice was served. (Points & Authorities in Support of Motion to Compel, 3:20-26.) On the other hand, Wang claims that he did indeed object to the deposition, and a copy of an

---

[11] Although the parties do not make any argument as to whether a subpoena is appropriately directed to SBC Pacific Bell, Plaintiff has alleged that Defendants' scheme was carried out by having funds improperly wired to Defendants' personal bank accounts; it may be that SBC Pacific Bell's lines were used to conduct these transfers.

[12] The motion originally filed sought to compel depositions of both Wang and Chen. Plaintiff subsequently withdrew its motion as to Chen. The Court therefore does not address any arguments regarding Chen's deposition.

objection dated 1 November 2007 is attached as an exhibit to the declaration in support of his opposition to Plaintiff's motion. The court file does not contain a proof of service of this objection, nor does Wang offer a proof of service. Nevertheless, the Court notes that the basis of the objection offered by Wang is similar to the arguments now before the Court.[13]

In opposition to Plaintiff's motion, Wang argues that pursuant to CCP § 2025.260, deposing him in Santa Clara County would be inappropriate given the expense he would incur and the "feasibility of conducting the deposition by written questions, . . . or using a discovery method other than a deposition." (CCP § 2025.260(b)(4),(6).) Wang points out that he had previously filed a declaration stating that he now lives in China. (Rafat Decl. in Support of Motion to Compel, Ex. 2.) Although there is no authority construing the term "residence" as it is used in the Civil Discovery Act, generally speaking, "'residence' is the place where one lives, even temporarily, regardless of intent to remain" and that "[p]ersons can have several residences concurrently." (Weil & Brown ¶ 3:151, citing DeYoung v. DeYoung (1946) 27 Cal 2d. 521, 524 and Marriage of Tucker (1991) 226 Cal.App. 3d 1249.)

In the instant case, although Wang maintains that he is currently in China, Plaintiff offers evidence that Wang maintains a residence in Saratoga. (Healy Supp. Decl. re: Motion to Compel.) This evidence includes Wang's admission to an allegation in Plaintiff's complaint that Wang resides in Saratoga. At this time, there is no evidence before the Court to contradict these assertions. Additionally, there is no evidence currently before the Court to suggest that Wang has permanently relocated to China and has no intent to return to Saratoga. The Court accordingly finds that Wang is a resident of Saratoga and Santa Clara County.

Moreover, despite Wang's assertion that a deposition by written questions is more appropriate, this alternative would not allow Plaintiff to obtain spontaneous testimony or to ask follow-up questions. (See Weil & Brown, at ¶ 8:758, p. 8E-125, noting that "this method is not suited for important and controversial testimony.") Plaintiff has alleged that Wang played a significant role in planning and executing a scheme to steal Plaintiff's business and trade secrets. Given the nature and complexity of Plaintiff's allegations, a deposition by written questions is not an appropriate alternative to a personal deposition, and it may be even more burdensome to proceed in this manner.

Accordingly, Plaintiff's motion to compel Wang's deposition in Santa Clara County is GRANTED.

### SANCTIONS

In their Motion to Quash, Defendants make a code-compliant request for monetary sanctions in the amount of $1,040. Plaintiff opposed Defendant's motion in good faith and with substantial justification, and was largely successful in opposing Defendant's motion. Accordingly, Defendant's request for monetary sanctions is DENIED.

Plaintiff does not move for sanctions in its Opposition to Defendants' Motion to Quash.

In its Motion to Compel, however, Plaintiff seeks $1,000 in monetary sanctions. Plaintiff's request is not code-compliant, in that it fails to "set[] forth facts supporting the amount of . . . monetary sanction sought." (CCP § 2023.040.) Accordingly, Plaintiff's request for monetary sanctions is DENIED.

Wang, in his opposition to Plaintiff's Motion to Compel, makes a code-complaint request for sanctions in the amount of $612.50, or $787.50 if this Court's tentative ruling is contested. Because Plaintiff succeeded in its motion, Defendant's request is DENIED.

### CONCLUSION

Defendants' Motion to Quash Subpoenas is GRANTED to the extent the subpoenas seek information pertaining to Triet Silva and Diane Bjorkstrom. The motion is otherwise DENIED. *All documents and responses are attorneys eyes only.*

[13] Moreover, although the matter has not been addressed in the pleadings now before the Court, it appears as if Wang's "objection vague, ambiguous, not reasonably particularized, privacy" as to the documents to be produced at the deposition is without merit. (Rafat Declaration in Support of Opposition to Motion to Compel, Ex. 4.) Plaintiff has requested documents pertaining to specified purchase contracts, LCD televisions, specified individuals and companies such as Qibee and NBC. The documents requested by Plaintiff therefore appear to be directly relevant to the allegations it makes against Wang.

Plaintiff's Motion to Compel Wang's Deposition and Production of Documents at Deposition is GRANTED.

All requests for monetary sanctions are DENIED.

DATED: 11 January 2008

HON. SOCRATES PETER MANOUKIAN
*Judge of the Superior Court*
*County of Santa Clara*

- ooOoo -